# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| JEREMY BENNETT,<br><br>                    Plaintiff,<br><br>v.<br><br>MARY MERTZ, in her official capacity as executive director of the Ohio Department of Natural Resources; KENDRA WECKER, in her official capacity as chief of the Division of Wildlife within the Ohio Department of Natural Resources; and CHRISTOPHER DODGE, in his official capacity as an officer for the Division of Wildlife,<br><br>                    Defendants. | Civil Case No. 2:21-cv-5318 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      This is a Fourth Amendment challenge to an Ohio Department of Natural Resources (ODNR) regulation and policy that empowers wildlife officers to search taxidermy and deer-processing shops without the owner's consent or a warrant. The regulation allows wildlife officers to "enter such establishment[s] . . . at all reasonable hours and inspect" for recordkeeping violations. Ohio Admin. Code 1501:31-15-02(P). In practice, ODNR wildlife officers unilaterally decide what counts as a "reasonable hour." Beyond that self-defined limitation, ODNR does not limit the timing, frequency, duration, or scope of its officers' inspections. Worse still, a shop owner who stands on his right to refuse a warrantless inspection—even if he just wants the officer to come back at a more convenient time—can be criminally prosecuted and thrown in jail. Ohio Rev. Code Ann. § 1533.67.

2.      Plaintiff Jeremy Bennett knows all of this firsthand. Jeremy runs a taxidermy and deer-processing shop on his property. For Jeremy, the shop is a private space: The shop sits just a few dozen feet from his home, where he and his wife homeschool their five young children. He has signs on the outside stating that the shop is open by appointment only. And he has signs on the inside stating that only employees can enter certain areas. Regardless, ODNR wildlife officers, including Defendant Christopher Dodge, have entered and inspected non-public areas of Jeremy's shop without a warrant several times. Over time, these inspections

have become increasingly intrusive and open-ended. And last year, when Jeremy denied Officer Dodge entry to his taxidermy shop (which was closed for the season) and invited Dodge to come back in a few weeks (when the shop was open), Jeremy was criminally prosecuted and threatened with jail time.

3. ODNR will continue to conduct warrantless inspections, and Jeremy will continue to risk prosecution for refusing inspections, for as long as ODNR's regulation and policy remain in place. But that is unconstitutional: The Fourth Amendment forbids "unreasonable searches." Warrantless inspections of private business premises are generally unreasonable. And that is especially so when government officials are empowered to inspect harmless and largely unregulated businesses—like taxidermy and deer processing in Ohio—without any meaningful constraints on the timing, frequency, duration, or scope of their inspections. Also, the Fourth Amendment does not allow government officials to criminally prosecute people who refuse to allow warrantless inspections in the moment.

4. To protect Jeremy's constitutional right to be free from unreasonable searches, the Court should declare that Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless taxidermy and deer-processing inspections, violate the Fourth Amendment. The Court should also permanently enjoin Defendants from conducting these and any similar warrantless inspections in the future.

## JURISDICTION AND VENUE

5.     Plaintiff is suing under the Fourth Amendment (as incorporated against the states through the Fourteenth Amendment); the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and civil-rights jurisdiction under 28 U.S.C. § 1343.

7.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and L.R. 82.1(c) because, as described below, at least one Defendant resides in Franklin County.

## PARTIES

8.     Plaintiff Jeremy Bennett runs a taxidermy and deer-processing shop on his residential property at 32845 Poling Road in Logan, Ohio. He is suing to prevent ODNR wildlife officers, including Defendant Christopher Dodge, from conducting future warrantless inspections of his shop.

9.     Defendant Mary Mertz is sued in her official capacity as director of ODNR. As director, Defendant Mertz "institute[s] all the policies and programs of the department of natural resources," including those challenged in this case. Ohio Rev. Code Ann. § 1501.01(A). Defendant Mertz performs her official duties, and thus resides for purpose of this suit, at ODNR's headquarters in Franklin County.

10.    Defendant Kendra Wecker is sued in her official capacity as chief of ODNR's Division of Wildlife. As chief, Defendant Wecker directs the Division's

efforts to "[e]nforce" state wildlife laws and regulations, including those challenged in this case. Ohio Rev. Code Ann. § 1531.04(C). Defendant Wecker performs her official duties, and thus resides for purposes of this suit, at ODNR's headquarters in Franklin County.

11.     Defendant Christopher Dodge is sued in his official capacity as an ODNR wildlife officer. As a wildlife officer, Defendant Dodge "enforce[s]" Ohio's wildlife laws and regulations, including by conducting the warrantless inspections challenged in this case. Ohio Rev. Code Ann. § 1531.13. Defendant Dodge is assigned to perform his official duties, and thus resides for purposes of this suit, in Hocking County.

## FACTS

### Jeremy's Taxidermy and Deer-Processing Shop

12.     Jeremy Bennett is a full-time taxidermist and deer processor in Logan, Ohio.

13.     Taxidermy is the art of preparing and mounting skins and other parts of deceased animals for display in a lifelike form.

14.     Deer processing is the skill of breaking down a deer carcass in a way that preserves its usable parts, including meat for human consumption.

15.     For Jeremy, a lifelong hunter, taxidermy is about helping his clients to preserve the memory of a hunt, while deer processing is about helping his clients enjoy the best cuts of meat from the deer they hunt.

16.     Jeremy started practicing taxidermy in 1997 as a junior in high school. He taught himself the basics using a mail-order course and started a small taxidermy business in his parents' basement.

17.     In 2001, Jeremy's parents gave him a 1.8-acre parcel of land. The parcel, located at 32845 Poling Road, is located just a few hundred yards down Poling Road from both his parents' home and his sister's home.

18.     In 2002, Jeremy designed and built his own house on the 1.8-acre parcel. Jeremy, his wife, and his (now) five young children have lived there ever since.

19.     For the first few years after building his house, Jeremy owned and operated a lawncare and landscaping business that served as his family's main source of income.

20.     During this period, Jeremy continued to do taxidermy part-time in his basement. Because his skills were improving and his customer base was growing, it soon became clear that Jeremy could turn taxidermy into his main source of income.

21.     In 2005, Jeremy took the leap. He sold his lawncare and landscaping business and made taxidermy his full-time job.

22.    In 2006, Jeremy designed and built a two-story shop on his property. The shop is located just a few dozen feet from his home.

23.    The following is a true and accurate photograph of Jeremy's shop:



24.    Also in 2006, Jeremy learned that many of his clients (who are largely hunters) were interested in deer-processing services, and that there was an unmet demand for a deer processor in the area. So Jeremy, building on some of the skills he had already developed as a taxidermist (like skinning deer), taught himself deer processing and started offering that service, too.

25.     While Jeremy has made improvements and additions to his shop over time, there has always been a clear division between the two parts of his business: taxidermy on the top floor, deer processing on the bottom floor.

26.     Both the taxidermy area (on the top floor) and the deer-processing area (on the bottom floor) have an external entrance through which customers can enter.

27.     While there is an internal staircase that connects the taxidermy area to the deer-processing area, the only way to access the staircase on either floor is by walking through employees-only work areas and opening a series of internal doors. Jeremy does not allow non-employees to use the internal staircase connecting his taxidermy and deer-processing areas.

28.     Thus, a customer who wanted to visit one part of Jeremy's shop (e.g., the taxidermy area on the top floor) after visiting the other part (e.g., the deer-processing area on the bottom floor) would have to exit Jeremy's shop and use the external entrance to enter the other part of the shop.

29.     Jeremy conducts his taxidermy and deer-processing work seasonally: He does deer processing from late September through January (during deer-hunting season), and he works on taxidermy mounts from February through late September. When one part of Jeremy's shop is open, he keeps the other part closed.

30.     Jeremy offers his taxidermy and his deer-processing services under a single business name and sole proprietorship: New Creations Taxidermy and Deer Processing.

31.     Over the years, Jeremy has worked hard to build New Creations into a thriving small business. He has earned an excellent reputation in the local hunting community (and beyond) for the quality of his taxidermy mounts and for the care he takes, as a processor, to ensure his clients get the cuts they desire.

32.     New Creations plays several core roles in Jeremy's life: It's how he supports his family, how he models passion and hard work for his children, how he serves the local hunting community he loves so much, and it's where he spends most of his time every day.

33.     Jeremy desires and expects privacy in his shop for several reasons.

34.     First, the shop is Jeremy's private property—property he designed and built by hand—so he demands control over who can enter and where they can go.

35.     Second, Jeremy's shop is open by appointment only. To enforce that policy, Jeremy has signs posted on the entrances to both floors, stating: "ENTRY BY APPOINTMENT ONLY. PRIVATE PREMISES."

36.     Third, there are areas within Jeremy's shop where customers are not allowed. Both floors have a front and a back room: The front rooms—the first areas people enter on either floor—are where Jeremy greets and interacts with customers.

The back rooms—accessed through internal doorways on each floor—are Jeremy's private workspaces. To keep his workspaces private, Jeremy has posted signs on the internal doorways to the back rooms on each floor, stating: "EMPLOYEES ONLY BEYOND THIS POINT. NO PUBLIC ACCESS."

37.     Fourth, the shop is intimately connected with Jeremy's family life. Jeremy's wife helps out with tasks around the shop. And the couple homeschool their five kids (the oldest of whom is 13). So throughout the day, the kids are often in and around the shop—whether that means doing school lessons or assignments there, visiting with dad, or bringing him food or a message from mom. Because the shop is so connected with his family life, Jeremy does not want people just showing up without warning or his consent.

### Ohio's Recordkeeping and Warrantless-Inspection Requirements

38.     Ohio does not require a license or any other kind of state permission to work as a taxidermist or deer processor.

39.     In fact, Ohio does not regulate the actual conduct of taxidermy or deer processing in any way.

40.     Ohio does, however, regulate hunting. In Ohio, it is illegal to hunt except "in the manner that the Revised Code or division rules prescribe." Ohio Rev. Code Ann. § 1531.02.

41. For example, hunters may only take deer or turkey during certain seasons, using certain weapons, and in certain quantities. *See, e.g.*, Ohio Admin. Code 1501:31-15-10, 1501:31-15-11.

42. And when they do so, they must log the kill by completing a permit or by tagging the animal. *See, e.g.*, Ohio Admin. Code 1501:31-15-10(F), 1501:31-15-11(F).

43. Ohio forbids anyone—including taxidermists and deer processors—from "possess[ing]" any illegally taken or improperly logged dead animal. Ohio Rev. Code Ann. § 1531.02.

44. To ensure that taxidermists and deer processors comply, ODNR requires that they

> maintain accurate diurnal records showing the dates when [any] wild animal or parts thereof were received, and when the same were disposed of, and the name and address of the owner of the wild animal or parts thereof, and the state or province from which the wild animal or parts thereof were taken and if applicable, the official tag or seal number or certificate of ownership number.

Ohio Admin. Code 1501:31-15-02(P).

45. ODNR does not require that taxidermists or deer processors keep these records in any particular form; it simply requires that they keep the required information "for a period of two years." *Id*.

46. To enforce the recordkeeping requirement, ODNR empowers officers within ODNR's Division of Wildlife to "enter [taxidermy and deer-processing]

establishment[s] . . . at all reasonable hours and inspect the records and premises where operations are being carried on." *Id*.

47. There is a stark contrast in how the inspections work depending on whether the inspecting officer has probable cause to believe the shop contains illegally hunted animals.

48. If a wildlife officer decides to inspect a shop with "good reason to believe" the shop contains illegally hunted animals, and the shop's owner/operator "refuses to permit the search," the officer may only proceed with the search if he "receiv[es] a search warrant" from "a court having jurisdiction of the offense." Ohio Rev. Code Ann. § 1531.13.

49. By contrast, if a wildlife officer decides to conduct an inspection *without* "good reason to believe" the shop contains illegally hunted animals, no comparable warrant requirement or other restrictions apply.

50. Thus, a wildlife officer who decides to conduct a suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P) is not required to obtain the shop owner/operator's consent or a warrant.

51. On information and belief, wildlife officers do not typically obtain consent or any kind of warrant before conducting suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

52.     There is no statute, regulation, or ODNR policy that requires wildlife officers to obtain a superior officer's approval before conducting a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P).

53.     On information and belief, wildlife officers do not typically obtain superior officers' approval before conducting warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

54.     There is no statute, regulation, or ODNR policy that requires wildlife officers to provide shop owners/operators advance notice before conducting a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P).

55.     On information and belief, wildlife officers do not typically provide shop owners/operators advance notice before conducting warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

56.     There is no statute, regulation, or ODNR policy that limits how often wildlife officers may conduct warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

57.     There is no statute, regulation, or ODNR policy that limits how long wildlife officers may take when conducting warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

58.     There is no statute, regulation, or ODNR policy that limits what wildlife officers may say or ask when conducting warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

59.     There is no statute, regulation, or ODNR policy that limits what items or containers wildlife officers may touch or open when conducting warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P).

60.     Moreover, the plain text of Ohio Admin. Code 1501:31-15-02(P) provides little guidance for inspecting officers. The regulation allows inspections "at all reasonable hours . . . where operations are being carried on"—but those terms are not defined in the regulation, by statute, or by any publicly accessible ODNR policy. So in practice, wildlife officers decide for themselves what counts as a "reasonable hour" and where "operations are being carried on" for purposes of inspection.

61.     It is a first-degree misdemeanor to "deter or attempt to deter a wildlife officer" from conducting a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P). Ohio Rev. Code Ann. §§ 1533.67, 1533.99(C).

62.     In Ohio, a person who commits a first-degree misdemeanor can be sentenced to up to 180 days in jail and fined up to $1,000. Ohio Rev. Code Ann. §§ 2929.24(A)(1), 2929.28(A)(2)(a)(i).

63.     Thus, a taxidermy or deer-processing shop owner/operator who refuses a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P)

can be criminally prosecuted, fined up to a thousand dollars, and thrown in jail for six months. And the conviction would be listed on the person's criminal record.

64.     There is no statute, regulation, or ODNR policy that requires wildlife officers to inform shop owners/operators that they can be prosecuted for refusing a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P).

65.     Because of the absence of meaningful legal constraints on wildlife officers' warrantless, suspicionless inspections under Ohio Admin. Code 1501:31-15-02(P), the timing, frequency, duration, and scope of the inspections depend, in practice, on each officer's personality and discretion in the field.

Officer Dodge's Warrantless Inspections of Jeremy's Shop

66.     For most of his career, Jeremy has maintained a good relationship with the wildlife officers who have inspected his taxidermy and deer-processing shop.

67.     But that changed when Defendant Dodge—a wildlife officer assigned to Hocking County in 2011—took over responsibility for inspecting Jeremy's shop under Ohio Admin. Code 1501:31-15-02(P).

68.     As soon as Defendant Dodge started leading inspections of Jeremy's shop, the inspections became longer and more intrusive.

69.     On March 25, 2015, for example, Defendant Dodge entered Jeremy's shop without advance notice and declared that he would be performing a records inspection.

15

70.     The inspection took about three hours. During that time, Defendant Dodge walked around the employees-only areas of Jeremy's shop, looked through Jeremy's business papers, opened cabinets and drawers, and explored Jeremy's coolers and freezers.

71.     In December 2015, Defendant Dodge called Jeremy at 6:15pm (when Jeremy was out for dinner) and commanded him to produce "all the tag numbers for every deer that came in the shop in 2014." Dodge wanted all of the 18-digit tag numbers—which were, at the time, recorded on two separate forms in Jeremy's shop—handwritten on a single form by 8:30 a.m. the following morning.

72.     After he returned home from dinner, Jeremy stayed up until 2:30 a.m. writing all the tag numbers on a single form by hand.

73.     Defendant Dodge arrived at Jeremy's shop around 10:30 a.m. the next morning. When Jeremy asked how long Dodge had known he would need the tag numbers, Dodge stated he had known for "a month or so" prior.

74.     On March 13, 2016, Defendant Dodge entered Jeremy's shop without advance notice to perform a records inspection. He did not knock or ask permission before entering; instead, he watched Jeremy's children enter the shop and followed them inside.

75.     Jeremy first became aware of Defendant Dodge's presence that day when Dodge entered the back (employees-only) room of Jeremy's taxidermy area while Jeremy was in the middle of working on a mount.

76.     Rather than greet Jeremy, Defendant Dodge started opening cabinets and drawers in Jeremy's private workspace. To the best of Jeremy's recollection, the two then exchanged the following remarks:

> JEREMY: "Can I help you find something?"
>
> DODGE: "No, just doing my inspection."
>
> JEREMY: "What are you looking for?"
>
> DODGE: "I'll let you know when I find it."
>
> JEREMY: "I don't much care for that."
>
> DODGE: "Everybody does something illegal. I just have to find out what you've done."

77.     The inspection that followed took almost five hours. During that time, Defendant Dodge walked around the employees-only areas of Jeremy's shop, looked through Jeremy's business papers, opened cabinets and drawers, and explored Jeremy's coolers and freezers.

78.     At one point, Defendant Dodge removed all the taxidermy items from every freezer and laid the frozen packages all over the floor. By the time Dodge finished his inspection, the items were so disorganized that Dodge was unable to put

them back where they belonged—so he told Jeremy to do it himself after the inspection was over.

79.     At various points during the inspection, Defendant Dodge also made comments about Jeremy's business operations that had nothing to do with the records Jeremy is required to keep. To the best of Jeremy's recollection, those comments included the following:

> DODGE: "You do more [taxidermy] mounts than anyone around. You need to leave some for the other guys. I want you to stop taking in mounts until I give you approval."

> DODGE: "I can't believe people would pay this much for a mount."

> DODGE: "You've been working on this bobcat mount for a while. If it's still here the next time I inspect you, I'm confiscating it."

> DODGE: "You need to keep your personal items out of the shop."

80.     At one point during the inspection, Jeremy stated he was frustrated with Dodge's lack of respect for his time, and brought up the incident from the previous year when Dodge had called and demanded a year's worth of tag numbers by the following morning. Dodge replied that Jeremy needed to stop asking about that incident—and that if Jeremy did not drop it, Dodge would arrest him.

81.     On December 9, 2020, Defendant Dodge called Jeremy to inform him that he was on the way to Jeremy's shop to perform a records inspection. This was the only time since Jeremy started doing taxidermy work in 1997 that he has ever received prior notice that a wildlife officer was coming to perform an inspection.

82.     While on the phone with Defendant Dodge, Jeremy stated he would prefer Dodge to come by another time because the taxidermy area (the top floor of his shop) was closed for the season and just being used for storage. Jeremy also stated he was very busy and short-staffed that day in the deer-processing area (the lower floor of his shop) because three employees who helped with deer processing were out with COVID-19. Dodge replied that he would come by anyway.

83.     Defendant Dodge showed up at Jeremy's shop a few minutes later accompanied by wildlife officer Ben Smith, whom Dodge was training on how to conduct taxidermy and deer-processing records inspections.

84.     Defendant Dodge and Smith entered the deer-processing area of Jeremy's shop and conducted an hour-long inspection. During the inspection, Dodge and Smith walked around the employees-only area of the bottom floor of Jeremy's shop, looked through Jeremy's business papers, and explored Jeremy's coolers and freezers.

85.     About halfway into the inspection, Defendant Dodge asked if he and Smith could go inspect Jeremy's taxidermy area on the top floor of the shop. Jeremy replied: "Yeah, not today, because it is a royal mess up there, and I mean big-time mess. But once we're [open] back up there in January, you're welcome to come back and look at it."

86.     Defendant Dodge then seemingly dropped his demand to inspect the taxidermy area and asked if he could see a pair of antlers listed in Jeremy's taxidermy records (which Jeremy had brought downstairs). Jeremy replied that the antlers were upstairs in the taxidermy area, but said: "I'll get [them] for you and bring [them] down here for you." When Jeremy returned with the antlers, Dodge inspected them and replied: "Very good."

87.     About 10 minutes later, Defendant Dodge again asked to inspect the taxidermy area on the top floor. The following conversation then took place:

> DODGE: "And then a no-go on us going in the taxidermy shop?"
>
> JEREMY: "Not today."
>
> DODGE: "Okay."
>
> JEREMY: "Like I said, if there's anything you need to see, I'll gladly bring it to you, but it's embarrassingly messy."
>
> DODGE: "Well, that's good that you guys have been busy."

88.     After that point, Defendant Dodge did not mention wanting to inspect the taxidermy area on the top floor, nor did he give any warning that Jeremy might have been doing something illegal by refusing immediate entry to that part of his shop.

89.     Following Defendant Dodge's December 9, 2020 inspection, Division of Wildlife Investigator Kirk Kiefer completed a "Law Enforcement Supplemental Report" in which he wrote: "The denial of the inspection by Mr. Bennett and the

reasons for the denial can only be answered by Mr. Bennett, however the fact remains Mr. Bennett did not allow the inspection to be conducted."

90.     Based on that perception of the incident, the Division requested and obtained prosecutor approval to charge Jeremy with two misdemeanors: (1) failing to allow an inspection in violation of Ohio Admin. Code 1501:31-15-02(P) and (2) deterring a wildlife officer from performing his duties in violation of Ohio Rev. Code Ann. § 1533.67.

91.     On March 24, 2021, Investigator Kiefer entered Jeremy's shop, handed Jeremy summonses for the two misdemeanors, and stated: "The prosecutor's office approved a couple of charges for not allowing that inspection."

92.     Kiefer explained: "The regulation is, if it's a reasonable time, you have to allow that [inspection]. . . . It's called like an administrative inspection. [Dodge] has the authority by the way the laws are to, in essence, look anywhere he wants."

93.     Kiefer also asserted: "The problem I'm trying to address is that when [Dodge] wanted to come up here, you should have just let him. By law, you have to. Hunting, fishing, trapping, it's all, it's been through the Supreme Court, it's all [a] highly regulated industry, is what they refer to it as."

94.     Later in the conversation, Jeremy asked Kiefer whether he could refuse an inspection because he was too busy that day, Kiefer replied: "If it's a reasonable time, you can't. You'll potentially face a charge like this."

95.     On October 18, 2021, Jeremy agreed to a plea deal to dispose of the charges: Jeremy pleaded no contest, and was found guilty of, refusing to allow an inspection under Ohio Admin. Code 1501:31-15-02(P), and paid a $150 fine. The charge for deterring a wildlife officer from performing his duties under Ohio Rev. Code Ann. § 1533.67, was dismissed.

96.     No wildlife officer has ever presented Jeremy with a warrant to search or inspect his shop.

97.     On information and belief, no wildlife officer has ever sought or obtained a warrant to search or inspect Jeremy's shop.

98.     No wildlife officer has ever informed Jeremy that he had the right to refuse an inspection or to seek the review of a neutral adjudicator before allowing an inspection.

99.     On information and belief, ODNR's policy and practice is that wildlife officers will conduct warrantless, suspicionless inspections of taxidermy and deer-processing shops under Ohio Admin. Code 1501:31-15-02(P) at least once per year.

### INJURY TO PLAINTIFF

100.    Defendant Dodge's warrantless, suspicionless inspections of Jeremy's shop have invaded Jeremy's property and privacy rights.

101. So long as Ohio Admin. Code 1501:31-15-02(P) remains on the books, and Defendants continue to enforce it with warrantless, suspicionless inspections, Jeremy's property and privacy rights will continue to suffer.

102. Defendant Dodge's warrantless, suspicionless inspections of Jeremy's shop have interfered with Jeremy's ability to run his business by forcing him to drop what he is doing to spend hours attending to Dodge's demands—even when Jeremy is extremely busy and would rather spend that time working on taxidermy mounts, processing deer, or attending to customers.

103. Defendant Dodge's warrantless, suspicionless inspections of Jeremy's shop have caused Jeremy to experience constant anxiety about the fact his private business premises can be invaded at any time and for however long Dodge pleases. That anxiety has manifested, at times, in periods when Jeremy was unable to eat and lost weight that he did not intend to lose.

104. Ever since Jeremy was criminally prosecuted for refusing Defendant Dodge immediate entry to the closed taxidermy area in his shop, Jeremy has not felt free to inform a wildlife officer that he is too busy for an inspection; to refuse a warrantless, suspicionless inspection; or to request reasonable limitations on the timing, frequency, duration, or scope of the inspections.

105. Because Ohio Admin. Code 1501:31-15-02(P) remains on the books and Defendants continue to enforce it, it is likely that Jeremy will be subjected to warrantless, suspicionless inspections in the future.

106. So long as Ohio Admin. Code 1501:31-15-02(P) remains on the books and Defendants continue enforce it, Defendants' warrantless, suspicionless inspections will continue to interfere with Jeremy's ability to run his business by forcing him to drop what he is doing to spend hours attending to the inspecting officer's demands—even when Jeremy is extremely busy and would rather spend that time working on taxidermy mounts, processing deer, or attending to customers.

107. So long as Ohio Admin. Code 1501:31-15-02(P) remains on the books and Defendants continue enforce it, Jeremy will continue to experience constant anxiety about the fact that his private business premises can be invaded at any time and for however long the inspecting officers please.

108. If, in the future, Jeremy refuses to allow a warrantless, suspicionless inspection under Ohio Admin. Code 1501:31-15-02(P) for any reason, it is likely that Defendants will seek prosecutor approval for criminal charges based on that refusal.

109. So long as Ohio Admin. Code 1501:31-15-02(P) remains on the books and Defendants continue enforce it, Jeremy will not be free to inform a wildlife officer that he is too busy for an inspection; to refuse a warrantless, suspicionless

inspection; or to request reasonable limitations on the timing, frequency, duration, or scope of the inspections.

110.   But for Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, Jeremy would have suffered none of these harms in the past and will suffer none of them in the future.

## LEGAL CLAIM

### (Fourth Amendment—Unreasonable Searches)

111.   The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

112.   The Fourth Amendment is incorporated against the states through the Fourteenth Amendment to the U.S. Constitution.

113.   Warrantless searches are *per se* unreasonable unless one of the narrow exceptions to the warrant requirement applies.

114.   The rule against warrantless searches applies to warrantless inspections of the non-public areas of private business premises.

115.   Ohio Admin. Code 1501:31-15-02(P) authorizes wildlife officers to perform warrantless, suspicionless inspections of the non-public areas of private business premises, including the non-public areas of Jeremy's shop.

116. Thus, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable unless one of the narrow exceptions to the warrant requirement applies.

117. On information and belief, Defendants do not possess and cannot produce evidence sufficient to show that an exception to the warrant requirement applies in this case.

118. Separate from violating the warrant requirement, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable for several reasons.

119. First, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable because they fail to offer an opportunity for precompliance review before a neutral decisionmaker before penalizing a shop owner/operator's refusal to allow a warrantless inspection.

120. Second, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable because they are primarily designed to facilitate criminal investigations by uncovering evidence that taxidermists, deer processors, and hunters have violated the state's wildlife laws.

121. Third, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable because

taxidermists and deer processors do not pose a clear or significant risk to the public health, safety, or welfare.

122.   Fourth, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable because they are not necessary to further a substantial government interest. ODNR could just as effectively inspect taxidermists' and deer processors' records by requesting consent or, if shop owners/operators refuse, by requiring officers to obtain an inspection warrant, which the officers could use to reappear at the shop without notice at a later time.

123.   Indeed, Ohio Rev. Code Ann. § 1531.13—which requires a wildlife officer to obtain a warrant when a shop owner/operator refuses an inspection based on "good reason to believe" the shop contains illegally hunted animals—shows that ODNR can enforce Ohio's restrictions on the possession of such animals without resorting to warrantless inspections at all.

124.   Fifth, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections, are unreasonable because neither Ohio Admin. Code 1501:31-15-02(P), nor any other statute, regulation, or ODNR policy meaningfully constrains the timing, frequency, duration, or scope of wildlife officers' inspections under Ohio Admin. Code 1501:31-15-02(P).

125. Accordingly, Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections of taxidermy and deer-processing shops, violate the Fourth Amendment.

126. Jeremy requests that the Court enter a judgment declaring that Ohio Admin. Code 1501:31-15-02(P), and Defendants' policy and practice of warrantless, suspicionless inspections of taxidermy and deer-processing shops, violate the Fourth Amendment.

127. Jeremy also requests that the Court enter an order enjoining Defendants from enforcing Ohio Admin. Code 1501:31-15-02(P) by conducting warrantless, suspicionless inspections of taxidermy and deer-processing shops.

128. Unless Jeremy obtains the declaratory and injunctive relief requested, he will suffer continuing and irreparable harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

A. For a judgment declaring that Ohio Admin. Code 1501:31-15-02(P) violates the Fourth Amendment, both on its face and as applied to Jeremy;

B. For a judgment declaring that Defendants' policy and practice of warrantless, suspicionless inspections of taxidermy and deer-processing shops violates the Fourth Amendment, both on its face and as applied to Jeremy;

C.    For an order permanently enjoining Defendants from enforcing Ohio Admin. Code 1501:31-15-02(P) by conducting future warrantless, suspicionless inspections of Jeremy's shop or of any similarly situated taxidermy and deer-processing shops;

D.    For an award of attorneys' fees and court costs;

E.    For all other legal and equitable relief to which Jeremy may be entitled.

Respectfully submitted,

/s/ Patrick T. Lewis
Patrick T. Lewis (0078314)
*Trial Attorney*
BAKER HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 861-7096 / Fax (216) 696-0740
plewis@bakerlaw.com

Joshua Windham*
Joseph Gay*
Robert Frommer*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jwindham@ij.org
jgay@ij.org
rfrommer@ij.org

*Counsel for Plaintiff*

*\*Pro hac vice applications to be filed*